UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| SHANGHAI BREEZE TECHNOLOGY CO., LTD | CASE NO. 6:22-CV-02038 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| GRAVOIS ALUMINUM BOATS, LLC D/B/A METAL SHARK ALUMINUM BOATS | MAGISTRATE JUDGE DAVID J. AYO |

**REPORT AND RECOMMENDATION**

Before the undersigned is DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56 (Rec. Doc. 30) filed by Defendant Gravois Aluminum Boats, LLC doing business as Metal Shark Aluminum Boats ("Gravois"). Plaintiff Shanghai Breeze Technology Co., Ltd. filed an opposition (Rec. Doc. 34) to which Gravois replied (Rec. Doc. 36). For the reasons set forth below, it is recommended that Gravois' motion be DENIED.

**I. Factual Background**

Shanghai Breeze is a corporation organized under Chinese law with a principal place of business in Shanghai, China. (Complaint at ¶1, Rec. Doc. 1). Gravois is a Louisiana limited liability company based in New Iberia, Louisiana. (*Id.* at ¶2). According to Shanghai Breeze's complaint, it contracted with Gravois on February 21, 2019 to construct a vessel identified as *21 Relentless*, for which it paid a 50% deposit of $108,078.00. (*Id.* at ¶¶V, VII). Shanghai Breeze also contracted with Gravois on August 8, 2019 for the construction of a second vessel, identified as *29 Defiant*, for which Shanghai Breeze paid in full the amount of $381,411.00. (*Id.*

1

at ¶¶VI, VIII). Gravois allegedly failed to deliver those vessels to Shanghai Breeze. (*Id.* at ¶IX). The complaint alleges that Gravois' failure to deliver the vessels constituted a breach of its contracts with Shanghai Breeze. (*Id.* at ¶¶IX, XII). Shanghai Breeze alleges that the vessels may have been embargoed but that Gravois had failed to provide documentation about any possible embargo, failed to identify the vessels' locations, and failed to refund the purchase price. (*Id.* at ¶XI). In addition to alleging a breach of contract, Shanghai Breeze pleads claims for conversion, a request for accounting, unfair competition/unfair trade practices, and unjust enrichment. (*Id.* at ¶¶XII-XV).

Gravois initially responded with a motion to dismiss pursuant to Rule 12(b)(6). (Rec. Doc. 9). By Report & Recommendation dated January 25, 2023, undersigned recommended that the motion be denied. (Rec. Doc. 16). Judge Hicks adopted that recommendation and entered an order denying Gravois' motion. (Rec. Doc. 17). Gravois now seeks summary judgment "because the contract between Gravois and Shanghai Breeze is illegal and unenforceable, and any recovery provided to Shanghai Breeze and Ge Song Tao would violate the Denial Order and thereby U.S. export controls." (Rec. Doc. 30-2 at 5). Therefore, resolution of the instant motion centers upon the effect of unrelated proceedings involving Ge Song Tao. What at first glance is a straightforward breach of contract action has an undercurrent of international intrigue.

Shanghai Breeze contracted with Gravois to construct *21 Relentless* on February 21, 2019. According to the Vessel Purchase Contract, the contract price

was $216,156.00 with a 50% deposit, 40% due upon completion of welding and receipt of the engine package, and 10% upon completion and ready to ship. (Rec. Doc. 34-3). A verbatim Vessel Purchase Contract was executed to construct *29 Defiant* except that the purchase price was $381,411.00 and had the same 40%/50%/10% payment schedule. (Rec. Doc. 34-4). According to Shanghai Breeze's complaint, it paid Gravois the full purchase price for *29 Defiant* rather than just the 40% deposit. (Rec. Doc. 1 at ¶¶ VI, VIII).

The intrigue interjects itself into this case on January 10, 2023, six months after the instant case was commenced, when the Bureau of Industry and Security of the United States Department of Commerce issued an "Order Denying Export Privileges" (the "Denial Order") to Ge. (Rec. Doc. 34-5).[1] The Denial Order was issued by John Sonderman, Director of the Office of Export Enforcement. (*Id.*). As discussed more fully below, the Denial Order references Ge's conviction in federal court. Based on the conviction, Sonderman decided to revoke Ge's export privileges for ten years from the date of Ge's conviction. Pertinent here, the Denial Order states:

> First, from the date of this Order until July 14, 2031, Ge Song Tao, with a last known address of [], and when acting for or on his behalf, his successors, assigns, employees, agents or representatives ("the Denied Person"), may not directly or indirectly participate in any way in any transaction involving any commodity, software or technology (hereinafter collectively referred to as "item") exported or to be exported from the United States that is subject to the Regulations, including, but not limited to:
> ***
> B. Carrying on negotiations concerning, or ordering, buying, receiving, using, selling, delivering, storing, disposing of, forwarding,

---

[1] This order is a matter of public record. 88 FR 2604-01, 2023 WL 184271 (F.R.).

3

>   transporting, financing, or otherwise servicing in any way, any transaction involving any item exported or to be exported from the United States that is subject to the Regulations, or engaging in any other activity subject to the Regulations; or
>   C.   Benefitting in any way from any transaction involving any item exported or to be exported from the United States that is subject to the Regulations, or from any other activity subject to the Regulations.
>                                                    \*\*\*
>   Third, pursuant to Section 1760(e) of [Export Control Reform Act] and Sections 766.23 and 766.25 of the Regulations, any other person, firm, corporation or business organization related to Ge by ownership, control, position of responsibility, affiliation, or other connection in the conduct of trade or business may also be made subject to the provisions of this Order in order to prevent evasion of this Order.

*Id.*

The conviction upon which the Denial Order was based derives from a criminal case against Ge and others in the Middle District of Florida. Gravois' motion addresses the criminal case and attaches a press release from the United States Attorney's Office for the Middle District of Florida announcing Ge's sentencing (Rec. Doc. 30-5) and the criminal complaint charging Ge and others. (Rec. Doc. 30-6). A review of the record of that criminal matter in Florida provides a more accurate picture of that proceeding.

On October 11, 2019, a criminal complaint was filed charging Fan Yang, Yang Yang, and Ge. (Rec. Doc. 1 in Case No. 3:19-cr-00192, Middle District of Florida). An indictment was returned on October 31, 2019 charging Fan, Yang, Ge, and Zheng Yan with multiple violations. (Rec. Doc. 36). It alleges that Fan was born in China and became a U.S. citizen in 2006. He enlisted in the U.S. Navy, was honorably discharged, obtained a degree in electrical engineering, reenlisted in the Navy, became a naval flight officer, obtained a Top Security clearance, and held the

4

rank of Lieutenant. (*Id*. at ¶ 1). Yang married Fan in 2013 and became a U.S. citizen in 2016. (*Id*. at ¶ 2). Ge was alleged to be a Chinese national who was legally present in the United States on a B1/B2 nonimmigrant visa. (*Id*. at ¶ 3). Zheng was identified as Ge's employee. (*Id*. at ¶ 4). Count One charged Fang, Yang and Ge with Conspiracy to Violate Federal Firearms Laws whereby Fan had purchased a Sig Sauer pistol for Ge, who was not an American citizen. (*Id*. at 8-9). Count Two charged Fan with False Statement to Federally Licensed Firearms Dealer since he had purchased the firearm on behalf of Ge. (*Id*. at 10). Count Three charged Fan with False Statement within the Executive Branch's Jurisdiction based on Fan's business relationship with foreigners Ge and Zheng. (*Id*. at 11).

More pertinent to this case, Count Four charged all four defendants with Conspiracy to Violate Export Laws with the conspiracy running from September 2018 to October 2019. (*Id*. at 17). The Manner and Means section for Count Four alleged that Ge and Zheng would have Shanghai Breeze purchase "U.S.-manufactured vessels that had both civilian and military applications for use in [China]." (*Id*. at 18, ¶ 4). Ge and Zheng enlisted BQ Tree, LLC, a company owned by Fan and Yang, to assist with the purchases. Yang was alleged to act as the primary point of contact with a California-based marine manufacturer and that Fan advised Yang regarding the transaction. (*Id*. at 18-19, ¶¶ 6-7). The goal of the conspiracy was to hide the fact that Shanghai Breeze was actually buying the vessels for use in mainland China and that Ge and Zheng arranged for wire transfers to the U.S. manufacturer to be made from Hong Kong rather than

5

mainland China. (*Id*. at 19, ¶ 7). Ge and Zheng provided Yang with a fictitious shipping address for the vessels, "Belt Consulting Company" in Hong Kong and a fictitious end user, "United Vision Limited" also in Hong Kong. (*Id*. at 19, ¶ 8).

The Overt Acts section alleged that Yang had inquired with the then-unidentified U.S. manufacturer about the purchase of inflatable vessels and had later requested a quote for Evinrude 55MFE engines, which are marketed "for military use." (*Id*. at 20, ¶¶ 11(a)-(c)). Ge and Zheng then caused the U.S. manufacturer to receive a $79,929.00 wire transfer from Belt Consulting in Hong Kong. Ge and Zheng later caused a $34,905.00 wire transfer to be sent to the U.S. manufacturer ostensibly from Belt Consulting in Hong Kong. (*Id*. at 21-22, ¶ 11(f)). After the U.S. manufacturer informed Yang that the goods were ready to ship upon receipt of the shipping information and end-user information, Yang responded that the shipping address was to Belt Consulting at a location in Hong Kong and that the end-user was United Vision Limited in Hong Kong. (*Id*. at 22, ¶ 11(g)). This resulted in the submission of a Shippers Export Declaration into the Automated Export System showing the end user as Belt Consulting in Hong Kong rather than Shanghai Breeze in China. (*Id*.).

Count Five charged all four defendants with False Export Information based on the false listing of Belt Consulting as the end user. (*Id*. at 22-23). Count Six charged Smuggling based on the defendants' attempt to export "from the United States seven inflatable vessels and associated accessories, including eight engines. . . ." (*Id*. at 23-24).

On November 2, 2020, Ge pled guilty to Counts Four and Six. (Plea Agreement, Rec. Doc. 275 in 19-cr-00192). The Factual Basis provided more clarity regarding the vessels at issue and were described as "combat rubber raiding craft" manufactured by Wing Inflatables, Inc. and the Evinrude engines. (*Id*. at 21-30). On July 16, 2021, Ge was sentenced to a 42-month term of imprisonment, three years of supervised release, and a $50,000 fine. (Rec. Doc. 402 in 19-cr-00192). Ge was ultimately deported to China upon completion of his sentence.

The timing of the two transactions between Shanghai Breeze and Gravois overlapped with the transactions discussed above. Again, the contracts for the two vessels from Gravois were executed on February 21, 2019 and August 8, 2019. These contracts were executed by Ge on behalf of Shanghai Breeze and not a straw purchaser as with the transactions for which Ge was prosecuted. On October 10, 2019, a Bill of Lading from Hansa Shipping Line listing Metal Shark Boats (Gravois) in Franklin, Louisiana as the Shipper and Shanghai Breeze in Shanghai, China as Consignee. (Rec. Doc. 34-5). The item being shipped was a "Boat on Cradle" to be loaded at the Port of Los Angeles and shipped to Shanghai, China. (*Id*.).

On October 24, 2019, Ariel Leinwand, Resident Agent in Charge of the Atlanta Resident Office of the Office of Export Enforcement of the Bureau of Industry and Security in the United States Department of Commerce issued a "Redelivery Letter" to Metal Shark Boats, Hansa Meyer Global, and Hapag-Lloyd America, Ltd. directing the redelivery of the vessel to Metal Shark/Gravois. (Rec.

Doc. 34-6). This document was issued two weeks after the Bill of Lading was issued and sixteen days after the submission of the false Shippers Export Declaration into the Automated Export System referenced in the indictment in Florida. (*See* Rec. Doc. 36 in 19-cr-00192 at 22, ¶ 11(g)). No evidence was submitted in connection with the instant motion showing the fate of the vessel after its redelivery to Gravois.

## II. Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Rule 56(a) also permits partial summary judgment on any part of a claim or defense. A fact is material if proof of its existence or nonexistence might affect the outcome of the lawsuit under the applicable governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citing *Anderson,* 477 U.S. at 252); *Hamilton,* 232 F.3d at 477.

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record that demonstrate the absence of genuine issues of material fact. *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir.2007) (citing *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986)). If the moving party carries its initial burden, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of a material fact. *Washburn v. Harvey*, 504 F.3d at 508. All facts and inferences are construed in the light most favorable to the nonmoving party. *Brumfield v. Hollins*, 551 F.3d at 326 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)).

### III. Analysis

Gravois essentially argues that it cannot be sued for breach of contract because the contracts to construct the two vessels became unenforceable based on the Denial Order revoking Ge's export privileges. When, as here, jurisdiction is based on diversity, courts apply the substantive law of the forum state. *Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 192 (5th Cir. 2010) (citing *Erie R. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)). Therefore, Louisiana law applies. Gravois' motion references the general Louisiana law concepts that courts will enforce a contract if it is not contrary to public policy and that if a bargain is found to be contrary to public policy, the state may restrict parties' right to contract. (Rec. Doc. 30-2 at 8) (citations omitted). While correct statements of law, the questions are whether the contracts at issue are against public policy, *i.e.*, illegal, and the effect of that alleged illegality on the parties.

On the first point, Gravois argues that "[u]pon the issuance of the Denial Order, the agreements between Gravois and Shanghai Breeze in connection with the Vessels became illegal and unenforceable." (*Id*. at 9). The Denial Order was issued January 10, 2023. (Rec. Doc. 34-5 at 5). By that date, the instant case had

9

been pending for six months. The contracts to construct the vessels are dated February 21, 2019 and August 8, 2019. Without saying as much or citing any Louisiana law in its memorandum, Gravois is contending that the two contracts are absolute nullities.[2] LA. CIVIL CODE. ANN. ART. 2030 states as follows: "A contract is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral. A contract that is absolutely null may not be confirmed. Absolute nullity may be invoked by any person or may be declared by the court on its own initiative." The two contracts at issue were to construct boats so it cannot credibly be contended that the objects of the contracts were illicit or immoral. Gravois does not assert that the two vessels were of such a nature, *e.g.*, military specification, that the contracting for their construction and sale was illegal or violative of some federal export[3] regulation *at the time*.[4] It thus appear that the prerequisites for a valid contract were satisfied. *Velazquez v. Brand Energy & Infrastructure Servs., Inc.*, 781 F. Supp. 2d 370, 375 (W.D. La. 2011) ("Under Louisiana law, formation of a valid and enforceable contract requires capacity, consent, a certain object, and a lawful cause."). The cases Gravois cites to support its argument on this point do not justify a conclusion that the objects of the

---

[2] Gravois' answer, filed two months after the date of the Denial Letter, pleads absolute nullity as an affirmative defense. (Rec. Doc. 18 at 4-5).

[3] As a Chinese company, Gravois had to know at the time of contracting that the vessels would be exported from the United States.

[4] Both contracts state that the vessels would be built to customer specifications. However, Gravois does not reference any unique specifications requested by Shanghai Breeze that would have rendered the vessels in violation of any regulation pertaining to the export of military-grade equipment, etc. In fact, per Gravois' website, *29 Defiant* is a standard model monohull pilothouse boat. metalsharkboats.com/29defiant/. The other contracted vessel, *21 Relentless*, is another standard model. metalsharkboats.com/21relentless/. If Shanghai Breeze had requested features that would have made the vessels more akin to the ones at issue in the criminal case, this Court is confident that Gravois would have stated as much.

contracts, two ostensibly standard model boats, were illicit, immoral or illegal *under Louisiana law* such that this Court can enter judgment as a matter of law. *See generally River Rental Tools, Inc. v. Smith Power Solutions, LLC*, 342 So. 3d 1052, 1058 (La. App. 4 Cir. 2022) (rejecting absolute nullity argument in breach of contract suit by buyer of pump engines against seller and noting, "The object of the sale was two engines. Neither the engines at issue, nor their sale, was illicit or immoral. They were sold on the open market. Their sale violated no statute or law.").

As a general matter, "A contract is null when the requirements for its formation have not been met." LA. CIVIL CODE ANN. ART. 2029. Gravois' argument does not assert nullity at the time of formation but rather nullity based on a subsequent, external event, *i.e.*, the Denial Order, that rendered performance of the contracts illegal. Even assuming the contracts became absolutely null years later, Louisiana law prescribes the remedy:

> An absolutely null contract, or a relatively null contract that has been declared null by the court, is deemed never to have existed. **The parties must be restored to the situation that existed before the contract was made. If it is impossible or impracticable to make restoration in kind, it may be made through an award of damages.**
> Nevertheless, a performance rendered under a contract that is absolutely null because its object or its cause is illicit or immoral may not be recovered by a party who knew or should have known of the defect that makes the contract null. The performance may be recovered, however, when that party invokes the nullity to withdraw from the contract before its purpose is achieved and also in exceptional situations when, in the discretion of the court, that recovery would further the interest of justice.

11

> Absolute nullity may be raised as a defense even by a party who, at the time the contract was made, knew or should have known of the defect that makes the contract null.

LA. CIVIL CODE ANN. ART. 2033 (emphasis added). This Court cannot conclude as a matter of law that the objects of the contracts illicit or immoral. The two contracts do not provide sufficient detail to justify such a conclusion. There is no evidence that the two vessels, because of their construction or equipment, were at the time of contracting or at some date thereafter would have been in violation of any export regulations. Even assuming, *arguendo*, that the contracts were absolutely null, Shanghai Breeze and Gravois "must be restored to the situation that existed before the contract was made." At this date, there is no evidence in the record to determine whether a restoration in kind can be made—which seems unlikely—but, failing that, restoration can be made via an award of damages. Discovery should at least be conducted on this issue.

This Court is not persuaded that the Denial Order has the preclusive effect that Gravois suggests such that Gravois is entitled to judgment as a matter of law. As discussed above, the Denial Order was issued on January 10, 2023, after Ge's sentencing in the Middle District of Florida. However, one of the vessels was completed[5] and in transit to Shanghai Breeze in China when the Office of Export Enforcement issued the Redelivery Letter. The Redelivery Letter merely stated as follows:

---

[5] The vessel being shipped was presumably the *29 Defiant* since it had been paid for in full. Shanghai Breeze and Gravois contracted for *29 Defiant* on August 8, 2019, and the Bill of Lading is dated October 10, 2019. Given the short turnaround, *29 Defiant* may have been a standard model which, if so, suggests it was an unremarkable standard model boat.

12

> The United States Department of Commerce is responsible for regulating the export of goods and technology as identified in the Export Administration Regulations (EAR). The Office of Export Enforcement (OEE), Bureau of Industry and Security, U.S. Department of Commerce is responsible for investigating matters pertaining to, and ensuring compliance with the EAR and the Export Control Reform Act (ECRA).
> 
> I am directing Metal Shark Boat and Hansa Meyer-Global to re-deliver the shipment identified below to: custody of Metal Shark Boat located at 160 Boro Lane, Franklin LA, [sic] 70538[.]

(Rec. Doc. 34-6). It does not state the statutory or regulatory basis on which it was issued nor does it state that the vessel was being exported in violation of federal law. This Court assumes that the Office of Export Enforcement's (OEE) authority to order redelivery derives from 15 C.F.R. § 758.7, which vests OEE officials with broad powers to carry out their duties under the Export Control Reform Act. More particularly, 15 C.F.R. § 758.8 addresses the return or unloading of cargo and subsection (b) states as follows in pertinent part:

> Ordering return or unloading of shipment. **In order to ensure compliance with export laws and regulations** administered or enforced by the Secretary, OEE officials, or any other official of the United States designated by OEE, may, with respect to a particular export, reexport, or transfer (in-country), **order any carrier to return or unload the shipment**. For the purpose of this section, furnishing a copy of the order to any person included within the definition of carrier will be sufficient notice of the order to the carrier. The carrier must, as ordered:
> ***
> (2) Return the shipment to the United States **or cause it to be returned**; . . . .

(emphasis added). It appears that the Redelivery Letter was issued during the early stages of OEE's investigation into Ge and his co-conspirators. If the shipment was returned to Gravois after the issuance of the Redelivery Letter on October 24,

13

2019, the question is begged of what happened to the vessel between that time and the issuance of the Denial Order on January 10, 2023.  Ge was obviously occupied with other pressing matters in Florida at the time.

Another open question is the effect of the Denial Letter issued to Ge on Shanghai Breeze's rights vis-à-vis the two Gravois vessels.  The forfeiture in Ge's criminal case did not involve the two Gravois vessels.  Also, OEE's issuance of the Redelivery Letter appears to have been an immediate means to halt an international export pending further investigation into its legality.  Gravois submits no evidence suggesting or establishing that OEE took any additional steps with the vessel that it ordered redelivered pursuant to the Redelivery Letter.[6]  Violations of the Export Control Reform Act, the Export Administration Regulations, and any orders or licenses are subject to administrative sanctions and include forfeiture of "[a]ny property seized pursuant to export laws and regulations administered or enforced by the Secretary. . . ."  15 C.F.R. § 764.3(c)(2)(i).  There is no evidence that OEE seized the Gravois vessel or effectuated the forfeiture of any vessel.  This Court assumes that evidence of seizure and/or forfeiture would lend further support to Gravois' nullity argument.  The most plausible characterization is that OEE did not conclude that any aspect of the export of the completed vessel violated any export regulation.  After all, OEE's knowledge of Ge and Shanghai Breeze's attempted purchases of the other vessels and engines likely prompted the Redelivery Letter in the first place.

---

[6] There is also no evidence of Gravois' efforts to reconcile its possession of a nearly $400,000 vessel for which it had received full payment.

This Court is also not persuaded that resolution of this matter in Shanghai Breeze's favor would result in a "benefit" to Ge as stated in the Denial Order. (*See* Rec. Doc. 34-5). This case is subject to Louisiana substantive law which prescribes a mechanism for unwinding a contract found to be absolutely null. Gravois cites no authority holding that an administrative order in an export proceeding directed to one person operates to preempt Louisiana law. In any event, Gravois is not entitled to judgment as a matter of law anyway on the nullity question for the reasons discussed above.

Based on the evidence and argument presented by Gravois, the undersigned cannot conclude that Gravois is entitled to judgment as matter of law. This Court is not persuaded that the Denial Order issued over three years after the execution of the two contracts and as many years subsequent to the attempted delivery of a completed vessel rendered those contracts absolutely null as a matter of Louisiana law. Even if the contracts were rendered null, it would appear that Gravois cannot entirely escape Shanghai Breeze's breach of contract claim based on LA. CIVIL CODE ANN. ART. 2033's guidance regarding the effect of an absolutely null contract.

## IV. Conclusion

For the reasons discussed herein, the Court recommends that DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56 filed by Defendant Gravois Aluminum Boats, LLC doing business as Metal Shark Aluminum Boats be DENIED.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. See *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. §636(b)(1).

THUS DONE in Chambers, Lafayette, Louisiana on this 30th day of March, 2024.

_____
David J. Ayo
United States Magistrate Judge