**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

SHANGHAI BREEZE TECHNOLOGY CO. LTD. — CIVIL ACTION NO. 22-2038

VERSUS — JUDGE S. MAURICE HICKS, JR.

GRAVOIS ALUMINUM BOATS, LLC D/B/A METAL SHARK ALUMINUM BOATS — MAGISTRATE JUDGE AYO

**MEMORANDUM OPINION**

This matter came on for a bench trial before the undersigned on August 7, 2026. Plaintiff Shanghai Breeze Technology Co., Ltd. (“Shanghai Breeze”) asserts claims against Defendant Gravois Aluminum Boats, LLC d/b/a Metal Shark Aluminum Boats (“Metal Shark”) for breach of contract, conversion, unjust enrichment, and violations of the Louisiana Unfair Trade Practices and Consumer Protection Law (“LUTPA”). Metal Shark asserts a counterclaim for breach of contract.

At the close of Shanghai Breeze's case-in-chief, Metal Shark moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c) and renewed its Motion at the close of the evidence. For the reasons stated in Record Document 107, the Court denied those Motions and elected to resolve the merits upon consideration of the complete trial record.

The Court has also issued a separate Memorandum Order identifying the exhibits properly before it. See Record Document 106. Accordingly, the findings below are based solely upon the testimony presented at trial, the exhibits identified in that Memorandum Order, and the parties' factual stipulations contained in the Pretrial Order.

Having considered the evidence, applicable law, and arguments of counsel, the Court now issues the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

### I. The Parties' Relationship

Shanghai Breeze is a Chinese company that entered into a business relationship with Metal Shark, a Louisiana boat manufacturer. See Defense Exhibit 1. At all relevant times, Ge Song Tao ("GST") acted as a representative of Shanghai Breeze in its transactions with Metal Shark. Chris Allard ("Allard") was the primary representative of Metal Shark in those transactions.

The parties' business relationship began at least as early as May 16, 2017, when they entered into a Teaming Agreement. See id. That agreement contemplated the potential sale and export of Metal Shark vessels to China and imposed certain requirements concerning compliance with United States export laws. See id. Thus, the parties expressly recognized that their transactions were subject to the Export Administration Regulations ("EAR") concerning certain military end-uses and military end-users. In fact, the Teaming Agreement specifically provided that "Part 744 of the EAR prohibits exports, re-exports and transfers (in country) for . . . military end-uses and military end-users . . .." See Defense Exhibit 1.

Metal Shark sold multiple vessels to Shanghai Breeze during the parties' business relationship before entering into the two contracts at issue here. See, e.g., Plaintiff Exhibit 14. There is no evidence before the Court that the export or delivery of those prior vessels to Shanghai Breeze was unlawful.

However, Allard's testimony at trial did establish that Metal Shark vessels were displayed on a webpage associated with Shanghai Shark Sprite Technology Company, Inc. ("Shark Sprite")[1] and marketed for potential military applications. See Defense Exhibit 10. There is no evidence that any Metal Shark boat listed on the webpage was actually sold by Shark Sprite. Metal Shark was unaware of the Shark Sprite webpage or any improper conduct by Shanghai Breeze during the early portion of the parties' relationship.

The evidence does establish, however, that Metal Shark was aware that Shanghai Breeze pursued certain governmental customers. As reflected in GST's sentencing transcript, Shanghai Breeze met with the Hong Kong Marine Police on September 20, 2017, accompanied by Henry Irizarry ("Irizarry"), a representative of Metal Shark. See Defense Exhibit 48 at 45. Thus, although the evidence does not establish that Metal Shark knew Shanghai Breeze was engaged in unlawful activity, Metal Shark was aware that Shanghai Breeze was pursuing business involving at least one foreign law-enforcement entity.

Then, according to Allard, the FBI approached Metal Shark around October 2018. The FBI expressed concern regarding Metal Shark's Chinese agent and requested Metal Shark's cooperation and information concerning its transactions with that agent. Metal Shark provided the FBI with contracts and other transactional information. Allard testified, however, that the FBI did not disclose the nature of its investigation or identify the conduct underlying its concerns. Thus, Metal Shark knew that the FBI had concerns regarding its

[1] Although the webpage identifies the company as Shark Sprite rather than Shanghai Breeze, the evidence establishes a close relationship between the entities through GST. For purposes of the factual issues relevant here, the Court finds that Shark Sprite's marketing activities are attributable to GST and relevant to the Court's consideration of Shanghai Breeze's conduct.

Chinese agent and was investigating matters related to that business relationship but did not know the nature or extent of those concerns.

Metal Shark nevertheless continued its business relationship with Shanghai Breeze. After the FBI's initial contact, Metal Shark entered into the February 2019 agreement for the 21 Relentless and the August 2019 agreement for the 29 Defiant.

## II. Ge Song Tao's Criminal Conduct

Separate from the two vessel transactions at issue here, GST became the subject of a federal criminal investigation concerning violations of United States export laws. See Defense Exhibits 47, 48, 74, & 75. The indictment in the Southern District of Florida alleged that, beginning no later than approximately September 2018, GST and others participated in a scheme involving the unlawful export of maritime equipment from the United States to China. See Defense Exhibit 74 at 20.

GST was arrested in October 2019. See Defense Exhibit 75. He ultimately entered a guilty plea in Miami, Florida, which established that he knowingly participated in unlawful conduct involving the export of Wing Inflatables vessels and Evinrude multi-fuel engines. See Defense Exhibit 47. Those particular vessels and engines were not purchased from Metal Shark.

However, the criminal proceedings did address some prior dealings involving Metal Shark. In particular, GST's plea agreement referenced uncharged conduct concerning a 40-foot Defiant vessel purchased from Metal Shark. See Defense Exhibit 47. Allard testified that the FBI later informed Metal Shark that its inclusion in the plea agreement

related to Breeze Tech[2] configuring that vessel for military use after it was received in China. GST's sentencing transcript also contains references to Metal Shark. See Defense Exhibit 48.

The Court finds that this evidence establishes that GST engaged in unlawful export-related activity contemporaneously with his business relationship with Metal Shark. It also establishes that prior dealings involving a Metal Shark vessel became relevant to the government's investigation of GST. However, the evidence before the Court does not establish that either the 29 Defiant or the 21 Relentless was intended for an unlawful end-user or unlawful end-use. Additionally, the evidence does not establish that the 29 Defiant or the 21 Relentless formed part of the criminal conduct for which GST was charged or convicted. Neither the indictment nor the plea agreement identifies either of these two contracts as an unlawful transaction. See Defense Exhibits 47 & 74.

## III. The 29 Defiant

In August 2019, Shanghai Breeze and Metal Shark entered into a written agreement for the purchase of the 29 Defiant vessel. See Defense Exhibit 9. The purchase price was $381,411.00. See id. Shanghai Breeze paid the purchase price, and Metal Shark constructed the vessel. See Record Document 75 at 2.

As part of the transaction, Shanghai Breeze executed an End User Certificate identifying the intended end-user of the vessel, and it states that Shanghai Breeze intended to resell the vessel and would provide a new end user certificate upon resale. See Defense Exhibit 11. Additionally, Allard testified that the 29 Defiant order was

[2] As previously determined by the Court on summary judgment, references in the parties' dealings to "Breeze Technology" do not establish an entity distinct from Shanghai Breeze for purposes of the transactions at issue. See Record Document 70 at 9–10.

expedited because Shanghai Breeze told Metal Shark that the vessel was meant for a trade show happening within the following months.

The evidence establishes that the 29 Defiant was not an inherently prohibited item. Allard testified that Metal Shark could lawfully sell a vessel of the same type to a Chinese purchaser today, provided the purchaser and transaction complied with applicable export restrictions. The government restrictions that subsequently blocked final delivery of the fully constructed 29 Defiant concerned the recipient and potential end-use of the vessel rather than the illegality of the vessel itself.

The vessel was completed and shipped from the United States in October 2019. See Defense Exhibit 28. The bill of lading identifies Shanghai Breeze as the consignee. See id. At the time the 29 Defiant was shipped, Shanghai Breeze had paid the full purchase price, Metal Shark had completed construction of the vessel, and Metal Shark had placed the vessel into shipment for delivery to Shanghai Breeze. Delivery was stopped in Hong Kong Harbor.

**IV. Government Intervention**

GST was arrested on October 17, 2019, only seven days after the 29 Defiant was shipped out of the United States. See Defense Exhibits 28 & 75. On October 24, 2019, the U.S. Department of Commerce Bureau of Industry and Security ("BIS") directed that the 29 Defiant be returned to the United States. See Defense Exhibit 70. Although the record does not establish the vessel's precise location when BIS issued the directive, it is undisputed that the vessel had not yet been delivered to Shanghai Breeze.

Metal Shark complied with BIS's directive and participated in arranging for the 29 Defiant to be redelivered to the United States. See Plaintiff Exhibit 18. In late 2019, Allard

informed a Shanghai Breeze representative identified as "Jason" that the United States government had stopped the shipment. See Defense Exhibit 35. Allard testified that the vessel ultimately arrived back at Metal Shark's facility in January 2020. Shipping the vessel back cost Metal Shark $18,686.76. See Record Document 70 at 15.

On March 11, 2020, BIS issued a formal detention notice directing that the 29 Defiant remain detained at Metal Shark's facility. See Defense Exhibits 40 & 41. The following day, BIS advised Metal Shark that it could inform Shanghai Breeze of the detention notice but was not required to do so unless Shanghai Breeze inquired. See Defense Exhibit 42. On September 21, 2020, BIS informed Metal Shark that it was no longer required to continue storing the vessel and that Metal Shark could dispose of it at its discretion, subject to the government's restrictions against delivery to Shanghai Breeze. See Defense Exhibit 46. The BIS directives mentioned nothing about returning the purchase price.

Metal Shark did not return any portion of Shanghai Breeze's $381,411.00 purchase payment. Allard testified that Metal Shark understood the governmental restrictions to prevent it from providing vessels, parts, or money to Shanghai Breeze. He also testified that Metal Shark believed it was entitled to retain the payment to offset expenses it incurred as a result of the failed transaction. The evidence does not establish, however, that BIS directed Metal Shark in 2019 or 2020 to retain Shanghai Breeze's purchase payment or advised Metal Shark that it was prohibited from refunding the purchase price. Nor does the evidence establish that Metal Shark sought guidance from BIS during that period regarding whether the purchase payment could be returned.

Allard testified that the 29 Defiant was stored at Metal Shark for approximately one year, beginning in January 2020. After BIS authorized Metal Shark to dispose of the vessel in September 2020, Metal Shark removed certain parts from the 29 Defiant for use on other vessels. Metal Shark did not maintain records sufficient to establish the value of the parts removed or any corresponding benefit received from their reuse. Metal Shark thereafter refurbished the 29 Defiant at a cost of $186,690.00 and sold the vessel to Sea Machines, a company located in Boston, Massachusetts, for $356,677.66.

Allard also testified regarding several categories of damages or losses claimed by Metal Shark in connection with the government's intervention and its dealings with Shanghai Breeze. Specifically, Metal Shark claimed $18,686.76 in redelivery costs; $1,508.75 in legal fees paid to Garcia & Artigliere; $252,164.38 in lost profits; $7,739.54 in insurance costs; $15,478.95 in security and compliance costs; and $186,690.00 in costs associated with refurbishing the 29 Defiant. The Court notes that the $18,686.76 redelivery expense has already been resolved in Metal Shark's favor on summary judgment. See Record Document 70 at 15. The remaining claimed losses are addressed in the damages section.

On January 31, 2022, BIS advised Metal Shark that if it intended to export the vessels, it would need to submit a new export license application. See Plaintiff Exhibit 8. There is no evidence that Metal Shark submitted a new license application or communicated this licensing option to Shanghai Breeze. In 2023, the Government entered an Order Denying Export Privileges against GST. See Defense Exhibits 58 & 59. Shanghai Breeze was also placed on the Entity List. See Defense Exhibit 60. Allard testified that Metal Shark understood these restrictions to prohibit it from providing

products, services, or money to GST or Shanghai Breeze. However, these restrictions were imposed years after the 29 Defiant was returned to Metal Shark and long after Metal Shark apparently elected not to return Shanghai Breeze's purchase payment. Accordingly, while the evidence establishes that Metal Shark ultimately understood the government's restrictions to prohibit returning money to Shanghai Breeze, the evidence does not establish that such a prohibition existed when Metal Shark initially retained the purchase price though Metal Shark was undoubtably skittish about any further dealings of any type with Shanghai Breeze.

## V. The 21 Relentless

In February 2019, Shanghai Breeze and Metal Shark entered into an agreement for the purchase of the 21 Relentless. See Defense Exhibit 2. The record contains two versions of the purchase agreement. See Plaintiff Exhibits 1 & 5; Defense Exhibit 2. The Court previously determined on summary judgment that the second version of the agreement controls. See Record Document 70 at 15. The Court reaffirms that determination. The email correspondence contained in Defense Exhibit 3 reflects that the second version was intended to govern the transaction, and Shanghai Breeze presented no witness testimony establishing a contrary understanding of the parties' intent.

The governing agreement required a 25% deposit, 40% upon commencement of construction, 25% upon completion of welding, and the remaining 10% upon completion of the vessel and readiness for shipment. See Defense Exhibit 2. The purchase price was $216,156.00, and Shanghai Breeze made a payment of $108,078.00 toward the vessel, which is approximately 50% of the purchase price. See Record Document 75 at 4–5. The

contract required Shanghai Breeze to pay 65% of the purchase price before Metal Shark was obligated to begin construction. See Defense Exhibit 2.

On summary judgment, the Court determined that Shanghai Breeze's failure to make the full required payment constituted nonperformance of an essential contractual obligation and granted summary judgment in Metal Shark's favor as to liability on its counterclaim for breach of the 21 Relentless agreement. See Record Document 70 at 15. The Court reaffirms that determination. However, the Court's prior ruling did not determine the consequences of Shanghai Breeze's breach. See id.

Although Shanghai Breeze had not made the full progress payment required to commence construction, Allard testified that Metal Shark had begun purchasing materials for construction of the 21 Relentless. Allard also stated that Metal Shark performed engineering and design work because the vessel was highly customized for Shanghai Breeze's intended use. According to Allard, the 21 Relentless was designed to fit on the back deck of a fisheries vessel and included specialized features for that purpose. The vessel itself, however, was never constructed.

Allard testified that Metal Shark incurred $63,685.74 in expenses for materials associated with the 21 Relentless and an additional $21,773.41 in labor, burden, and overhead costs. Metal Shark contends that these expenses constitute damages resulting from Shanghai Breeze's breach. The nature and recoverability of those claimed damages are addressed in the damages section.

The Court notes that the evidence supporting these amounts was limited. During Allard's testimony, the parties discussed several invoices from vendors supplying materials for the 21 Relentless, some of which reflected that the underlying orders had

been cancelled. Allard also acknowledged that Metal Shark's records were insufficient to establish precisely which materials were purchased and paid for, which amounts were refunded, and which materials were ultimately used on other vessels. Moreover, the underlying invoices were not presented to the Court as evidence. Accordingly, although Allard testified to the amounts claimed by Metal Shark, those figures are not independently corroborated by the evidence before the Court. The Court will afford Allard's testimony concerning these claimed expenses the weight it deems appropriate in light of these evidentiary limitations.

Although Shanghai Breeze failed to make the full progress payment, Metal Shark did not terminate the agreement on that basis before the government intervened with respect to the 29 Defiant. Rather, Allard testified that following the government's intervention, Metal Shark decided that it would no longer continue doing business with Shanghai Breeze.

In late 2019, Allard informed a Shanghai Breeze representative identified as "Jason" that the government had stopped the shipment of the 29 Defiant. See Defense Exhibit 35. On January 20, 2020, Shanghai Breeze emailed Metal Shark regarding both the 29 Defiant and 21 Relentless. See Defense Exhibit 38. Allard testified that Metal Shark did not respond to the communication or resume its work on the 21 Relentless, and the vessel was never constructed or delivered. Nevertheless, Metal Shark did not return the amount Shanghai Breeze had previously paid toward the 21 Relentless.

Although the government specifically intervened to stop and order the 29 Defiant's return, the evidence does not establish that BIS issued a comparable detention or redelivery directive concerning the 21 Relentless at that time. Additionally, the evidence

does not establish that, when Metal Shark decided to discontinue the 21 Relentless transaction, BIS had directed Metal Shark to retain Shanghai Breeze's prior payments or prohibited Metal Shark from returning those funds.

As discussed above, the government entered an Order Denying Export Privileges against GST in 2023, and Shanghai Breeze was placed on the Entity List. See Defense Exhibits 58 & 60. Allard testified that Metal Shark ultimately understood these restrictions to prohibit it from providing products, services, or money to GST or Shanghai Breeze. Those restrictions, however, arose years after Metal Shark had ceased further performance of the 21 Relentless agreement and retained Shanghai Breeze's prior payment.

Accordingly, the evidence establishes that Shanghai Breeze breached the 21 Relentless agreement by failing to make the required progress payment, but Metal Shark subsequently elected to discontinue the transaction following the government's intervention concerning the 29 Defiant. The legal consequences of the parties' respective actions and entitlement to damages are addressed below.

## CONCLUSIONS OF LAW

### I. Governing Law

This case is before the Court based on diversity jurisdiction. See Record Document 75 at 1. Accordingly, the Court applies Louisiana substantive law and federal procedural law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).

### II. Absolute Nullity

Before addressing Shanghai Breeze's individual causes of action, the Court must determine the legal effect of GST's criminal conduct and the subsequent government

intervention upon the parties' agreements. Metal Shark principally contends that the contracts were absolutely null because they were entered into for an unlawful purpose.

Under Louisiana law, "[t]he cause of an obligation is unlawful when the enforcement of the obligation would produce a result prohibited by law or against public policy." La. Civ. Code art. 1968. Likewise, "[a] contract is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral." Id. art. 2030. Under Article 1831, "[a] party who asserts that an obligation is null . . . must prove the facts or acts giving rise to the nullity . . .." Therefore, Metal Shark bears the burden of establishing facts sufficient to support its defense that the contracts at issue were absolutely null. The Court finds that Metal Shark has not met that burden.

GST unquestionably engaged in unlawful export-related conduct contemporaneously with the parties' business relationship, which is established by his guilty plea. See Defense Exhibit 47. Likewise, the evidence demonstrates that Shanghai Breeze pursued potential military or governmental customers and that at least one prior Metal Shark vessel became relevant to the government's investigation of GST. See Defense Exhibit 47. However, the issue before this Court is not whether GST committed export-related crimes. The question is whether the two contracts before this Court (the 29 Defiant and 21 Relentless) had an unlawful object or cause. The evidence does not establish that they did.

Neither the indictment nor GST's plea agreement identifies the 29 Defiant or 21 Relentless as part of the criminal conduct for which GST was charged or convicted. See Defense Exhibits 47 & 74. Although the plea agreement references certain uncharged conduct involving a different 40-foot Defiant previously purchased from Metal Shark,

neither of the vessels presently before the Court is similarly identified. The evidence likewise does not establish that either vessel was inherently prohibited from export to China. Allard testified that Metal Shark could lawfully sell the same type of vessels to an eligible purchaser in China, provided the transaction complied with applicable export restrictions.

Although not dispositive, the evidence also reflects that Shanghai Breeze represented to Metal Shark that the vessels were intended for specific, lawful commercial purposes. Allard testified that Shanghai Breeze requested expedited completion of the 29 Defiant because the vessel was intended for display at an upcoming trade show. As to the 21 Relentless, Allard testified that the vessel was specially designed and customized to fit on the back deck of a fisheries vessel. While these representations do not establish the vessels' ultimate intended end-use, they provide additional evidence that the contracts themselves contemplated lawful transactions at their inception.

The Court will not infer that these two transactions were unlawful merely because GST engaged in other unlawful conduct during the same period. Metal Shark asks the Court, in effect, to infer from GST's proven criminal activity that these particular contracts must also have been components of the same unlawful scheme. The evidence presented at trial does not permit the Court to make that finding by a preponderance of the evidence. Accordingly, the Court finds that the 29 Defiant and 21 Relentless agreements were valid contracts and rejects Metal Shark's defense of absolute nullity.

This conclusion also disposes of Metal Shark's reliance on Louisiana Civil Code article 2033. Article 2033 governs restoration following a declaration of nullity and contains special limitations upon recovery by a party who knew or should have known of

the defect rendering a contract null. Because the Court finds that the contracts were not absolutely null, Article 2033 does not govern the parties' respective rights.

## III. The 29 Defiant

### 1. Breach of Contract

The Court next considers the legal effect of the government's intervention on the parties' performance of the 29 Defiant agreement. Louisiana Civil Code article 1875 defines a fortuitous event as "one that, at the time the contract was made, could not have been reasonably foreseen." Article 1873 provides that "[a]n obligor is not liable for his failure to perform when it is caused by a fortuitous event that makes performance impossible." An obligor remains liable, however, when he has assumed the risk of the fortuitous event or when the event "has been preceded by his fault, without which the failure [to perform] would not have occurred." Id.

The Court first finds that the government's intervention constituted a fortuitous event within the meaning of Article 1875. The evidence demonstrates that both parties were aware of circumstances suggesting some degree of risk associated with their continuing business relationship. GST was engaged in unlawful export-related activity during the same general period. Metal Shark, for its part, knew that Shanghai Breeze pursued business involving at least one foreign law-enforcement entity, and the FBI had approached Metal Shark to express concerns regarding Metal Shark's Chinese agent and requested information concerning that relationship months before either of the contracts at issue were executed.

However, those circumstances do not establish that the particular government intervention that occurred here was reasonably foreseeable when either contract was

executed. As explained above, the Court has found insufficient evidence that the contracts at issue were unlawful. The evidence likewise does not establish that either party reasonably anticipated that BIS would intervene while the 29 Defiant was in transit, direct that it be returned to the United States, and thereafter prevent its delivery to Shanghai Breeze. The Court therefore finds that the government's intervention constituted a fortuitous event under Article 1875. That intervention made Metal Shark's performance impossible at the time it occurred. Therefore, under Article 1873, Metal Shark is not liable for nonperformance resulting from its compliance with BIS's directive.

The Court next considers the fault exception contained in Article 1873. Although the government's intervention constituted a fortuitous event, Article 1873 does not excuse nonperformance when the fortuitous event "has been preceded by [the obligor's] fault, without which the failure [to perform] would not have occurred." The Court finds that exception applicable here.

As explained above, the Court has found insufficient evidence that the 29 Defiant agreement itself was unlawful or that the vessel formed part of GST's criminal scheme. However, that determination does not sever the causal relationship between GST's unlawful conduct and the government's intervention in this transaction. GST's conduct prompted the federal investigation into the parties' relationship and ultimately resulted in his arrest.

Therefore, the evidence establishes the causal connection contemplated by Article 1873. But for GST's unlawful conduct, the federal investigation that resulted in BIS's intervention would not have occurred, and nothing in the record suggests that the otherwise lawful 29 Defiant transaction would not have proceeded to completion. Stated

differently, although the 29 Defiant contract was not shown to be illegal, the fortuitous event that prevented completion of the transaction was preceded by unlawful conduct attributable to Shanghai Breeze, without which Metal Shark's inability to perform would not have occurred.

Thus, the Court finds that Shanghai Breeze bears responsibility under the fault exception of Article 1873 for the consequences of the government's intervention. Metal Shark is not liable for its inability to complete the transaction while complying with BIS's directives. This finding, however, does not mean that Metal Shark is entitled to retain the entire purchase payment for the 29 Defiant. Article 1873 determines which party bears responsibility for the failure of performance; Articles 1994 and 1995 determine the resulting monetary consequences.

Louisiana Civil Code article 1994 provides that "[a]n obligor is liable for the damages caused by his failure to perform a conventional obligation." Article 1995 provides that "[d]amages are measured by the loss sustained by the obligee and the profit of which he has been deprived." Thus, Metal Shark is entitled to recover the losses sustained and lost profits it proves were caused by Shanghai Breeze's fault and resulting failure of the transaction. The purpose of that recovery is to compensate Metal Shark for the consequences of the failed transaction, not to place Metal Shark in a better economic position than performance of the contract would have produced.

Accordingly, the Court's damages analysis must account for the entire economic result of the failed transaction. This includes the $381,411.00 purchase price paid by Shanghai Breeze, the proceeds Metal Shark subsequently received from the eventual sale of the 29 Defiant to Sea Machines, and the losses and lost profits Metal Shark proves

were caused by Shanghai Breeze's fault. The precise amount ultimately recoverable is addressed in the damages section below.

2. Metal Shark's Counterclaim

Metal Shark asserts a counterclaim for breach of the 29 Defiant contract. However, as explained above, the failure of this transaction does not arise from Shanghai Breeze's nonperformance of an express contractual obligation. Shanghai Breeze paid the full purchase price, Metal Shark constructed and shipped the vessel, and the transaction failed only after BIS intervened.

The Civil Code addresses the circumstances presented here, and the Court has determined that the government's intervention constituted a fortuitous event under Article 1875 and that the fault exception contained in Article 1873 governs liability for the resulting failure of performance. Because the Court has addressed the parties' respective responsibility for the failed transaction under the applicable codal provisions, no separate determination that Shanghai Breeze breached the 29 Defiant agreement is necessary.

Accordingly, Metal Shark's entitlement to recover losses resulting from the failed 29 Defiant transaction is governed by the codal framework discussed above. The nature and amount of any recoverable damages are addressed below.

3. Conversion

Under Louisiana law, conversion is an intentional tort consisting of unlawful interference with one's ownership or possession of a movable. See Dual Drilling Co. v. Mills Equip. Invs., Inc., 721 So. 2d 853, 857 (La. 1998). According to the Louisiana Supreme Court, conversion occurs when any of the following occurs:

> 1) possession is acquired in an unauthorized manner; 2) the chattel is removed from one place to another with the intent to exercise control over

> it; 3) possession of the chattel is transferred without authority; 4) possession is withheld from the owner or possessor; 5) the chattel is altered or destroyed; 6) the chattel is used improperly; or 7) ownership is asserted over the chattel.

Id. Simply stated, conversion requires a wrongful exercise of authority over another's property. See id.

a. *The 29 Defiant Vessel*

Shanghai Breeze contends that Metal Shark converted the 29 Defiant when it regained possession of the vessel, subsequently removed parts from it, refurbished it, and ultimately sold it to another purchaser. The Court finds that Shanghai Breeze has not established conversion with respect to the 29 Defiant vessel itself.

The evidence establishes that Shanghai Breeze owned the 29 Defiant while the vessel was in transit. The bill of lading identifies Shanghai Breeze as the consignee, and the Court finds that ownership had transferred to Shanghai Breeze before the government intervened. See Defense Exhibit 28. Thus, when BIS directed that the vessel be returned to the United States, the 29 Defiant belonged to Shanghai Breeze.

Ownership, however, does not resolve the conversion inquiry. The question is whether Metal Shark wrongfully exercised dominion or control over Shanghai Breeze's property. The initial interference with Shanghai Breeze's possession was undertaken by the United States government, not Metal Shark. BIS directed that the vessel be returned to the United States, and Metal Shark complied with that directive. Once the vessel returned to Metal Shark's facility, BIS subsequently issued a formal detention notice requiring the vessel to remain there. Therefore, Metal Shark's initial possession of the 29 Defiant was neither unauthorized nor wrongful.

The circumstances changed in September 2020, when BIS released Metal Shark from its obligation to continue storing the vessel and advised that Metal Shark could dispose of it at its discretion, provided that it was not delivered to Shanghai Breeze. Metal Shark thereafter removed certain parts from the vessel, refurbished it, and ultimately sold it to another purchaser. Those actions unquestionably constituted exercise of dominion over the vessel. By that time, however, the government had expressly authorized Metal Shark to dispose of the vessel and prohibited its delivery to Shanghai Breeze.

To the extent Shanghai Breeze maintains that the government wrongfully deprived it of its property, any claim arising from that alleged governmental deprivation would lie, if at all, against the United States through an appropriate cause of action. The Court expresses no opinion as to the availability or merits of any such claim. However, what Shanghai Breeze cannot do is transform the government's interference with its property into a conversion claim against Metal Shark merely because Metal Shark complied with the government's directives. Accordingly, Shanghai Breeze has failed to establish conversion of the 29 Defiant vessel.

*b. <u>The 29 Defiant Funds</u>*

Shanghai Breeze's purchase payment for the 29 Defiant presents a separate question. Shanghai Breeze paid Metal Shark $381,411.00 for the 29 Defiant, and Metal Shark retained those funds after the government prevented completion of the transaction. The fact that Metal Shark lawfully received the payment in the first instance does not necessarily preclude conversion based upon its subsequent retention.

Louisiana law recognizes that funds owed pursuant to a contractual relationship may support a conversion claim when their retention constitutes an exercise of dominion

inconsistent with the plaintiff's rights. See Albe v. Lenter, No. CV 18-5389, 2019 WL 95468, at *4 (E.D. La. Jan. 3, 2019); see also La. Health Care Grp., Inc. v. Allegiance Health Mgmt., Inc., 32 So. 3d 1138, 1142–43 (La. App. 3 Cir. 2010).

To establish conversion of funds, a plaintiff must demonstrate that it owned the funds, that the defendant's exercise of control over those funds was inconsistent with the plaintiff's rights, and that the conduct constituted a wrongful taking of the funds. See Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc., 783 F.2d 480, 484 (5th Cir. 1986). Moreover, conversion does not require an intent to engage in conscious wrongdoing; it requires an intent to exercise dominion or control inconsistent with the plaintiff's rights. See La. State Bar Ass'n v. Hinrichs, 486 So. 2d 116, 121 (La. 1986).

The Court finds that Shanghai Breeze has established conversion of its purchase payment. Shanghai Breeze paid Metal Shark $381,411.00 for the 29 Defiant. Although Metal Shark lawfully received those funds pursuant to the parties' agreement, the transaction was never completed, Shanghai Breeze never received the vessel, and Metal Shark ultimately regained possession of the vessel and sold it to another purchaser. Nevertheless, Metal Shark retained the entirety of Shanghai Breeze's purchase payment.

The Court's determination that Shanghai Breeze bears responsibility under Article 1873 for the fortuitous event does not establish that Metal Shark acquired an unconditional right to retain the entire purchase price. Rather, as discussed above, Metal Shark is entitled to recover the losses caused by Shanghai Breeze's fault and any profit of which it was deprived. See La. Civ. Code arts. 1994–1995. Those contractual rights did not authorize Metal Shark to retain Shanghai Breeze's entire payment irrespective of the amount of damages actually sustained.

Moreover, the evidence does not establish that the government directed Metal Shark to retain the purchase payment. Metal Shark instead exercised control over those funds based upon its own determination that it was entitled to retain them. The Court therefore finds that Shanghai Breeze has established its claim for conversion of the funds associated with the 29 Defiant. The damages attributable to that conversion are addressed below.

4. Unjust Enrichment

Louisiana Civil Code article 2298 provides a cause of action for unjust enrichment but expressly states that the remedy "shall not be available if the law provides another remedy for the impoverishment . . .." Thus, unjust enrichment is a subsidiary remedy and is unavailable when the plaintiff has another legal remedy.

Here, the Court has rejected Metal Shark's absolute nullity defense and determined that the 29 Defiant agreement was a valid contract. Moreover, the parties' rights concerning the purchase payment and the economic consequences of the failed transaction are governed by the valid contract and the Civil Code provisions governing contractual obligations and damages. Therefore, Shanghai Breeze has an available contractual remedy for the same alleged impoverishment underlying its unjust enrichment claim. Accordingly, Shanghai Breeze cannot recover under unjust enrichment with respect to the 29 Defiant.

5. LUTPA

LUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . .." La. R.S. 51:1405(A). In Coffey v. Peoples Mortgage & Loan of Shreveport, Inc., the court stated that "a practice is unfair

when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." 408 So. 2d 1153, 1156 (La. App. 2d Cir. 1981). The range of conduct prohibited by LUTPA is "extremely narrow" and generally encompasses only "egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct . . .." Cheramie Services, Inc. v. Shell Deepwater Prod., Inc., 35 So. 3d 1053, 1060 (La. 2010).

Shanghai Breeze has not established conduct rising to this level. The evidence establishes that Metal Shark constructed the 29 Defiant and placed it into shipment in accordance with the parties' agreement. The transaction failed only after BIS intervened and directed that the vessel be returned to the United States. Thus, the failure of the transaction itself was not the product of fraud, deception, or a scheme by Metal Shark to obtain Shanghai Breeze's purchase payment without providing the vessel.

The stronger basis for Shanghai Breeze's LUTPA claim arises from Metal Shark's conduct after the government intervened. Metal Shark retained Shanghai Breeze's $381,411.00 purchase payment, regained possession of the vessel, subsequently removed certain components from it, refurbished it, and ultimately transferred the vessel to another purchaser. As explained above, the Court concludes that Metal Shark was not entitled to retain Shanghai Breeze's entire contractual payment. That conclusion, however, does not establish a LUTPA violation.

The evidence does not demonstrate that Metal Shark concealed its possession of the vessel, misrepresented the government's actions, or otherwise employed fraud or deception to deprive Shanghai Breeze of its payment. Rather, Allard testified that Metal Shark understood the government restrictions to prevent further dealings with Shanghai

Breeze and believed that it was entitled to retain the purchase payment against expenses and losses attributable to the failed transaction. Although Metal Shark did not consistently communicate with Shanghai Breeze regarding its subsequent communications with BIS, the evidence does not establish that this lack of communication was undertaken for a fraudulent or deceptive purpose.

Moreover, Metal Shark's decision to discontinue its business relationship with Shanghai Breeze following the government's intervention was itself a permissible exercise of business judgment. As the Fifth Circuit has recognized, "LUTPA does not prohibit sound business practices, the exercise of permissible business judgment, or appropriate free enterprise transactions." Turner v. Purina Mills, Inc., 989 F.2d 1419, 1422 (5th Cir.1993). Given the government's intervention, GST's arrest, and the uncertainty surrounding the parties' ability to continue doing business, Metal Shark's decision to terminate the relationship does not constitute the type of egregious conduct prohibited by LUTPA.

The Court ultimately rejects Metal Shark's position that it was entitled to retain the entire purchase price. But an incorrect assertion of contractual rights, without accompanying fraud, deception, misrepresentation, or similarly unethical conduct, does not transform a contract dispute into an unfair trade practice. At its core, this dispute concerns the parties' respective rights following an unusual governmental intervention. The Civil Code supplies the mechanism for resolving that dispute. Accordingly, the Court finds that Shanghai Breeze has failed to establish its LUTPA claim concerning the 29 Defiant.

## IV. The 21 Relentless

1. Breach of Contract

The Court next considers Shanghai Breeze's breach of contract claim concerning the 21 Relentless vessel. As discussed in the Court's Findings of Fact, the governing 21 Relentless agreement required Shanghai Breeze to make a 25% deposit followed by an additional 40% payment before Metal Shark was required to commence construction. Shanghai Breeze paid Metal Shark $108,078.00, approximately 50% of the purchase price, but failed to remit the full progress payment required under the agreement.

The Court previously addressed the legal effect of that nonperformance on summary judgment. Because Metal Shark's obligation to commence construction was contingent upon receipt of the required progress payments, the Court determined that Shanghai Breeze's failure to remit the full amount due constituted nonperformance of an essential contractual obligation. See Record Document 70 at 15. Accordingly, the Court granted summary judgment in Metal Shark's favor as to liability for Shanghai Breeze's breach of the 21 Relentless agreement. The Court reaffirms that determination.

The evidence presented at trial does not alter that conclusion. Although Metal Shark collected some materials in anticipation of constructing the 21 Relentless, Shanghai Breeze never satisfied the payment condition to trigger Metal Shark's contractual obligation to commence construction. Accordingly, Shanghai Breeze cannot establish that Metal Shark breached the agreement by failing to proceed with construction while Shanghai Breeze itself had not performed the contractual obligation upon which Metal Shark's performance depended.

The Court recognizes that Metal Shark subsequently elected to discontinue its business relationship with Shanghai Breeze following GST's arrest and the government's intervention concerning the 29 Defiant. However, unlike the 29 Defiant, the evidence does not establish that BIS issued any directive specifically prohibiting performance of the 21 Relentless agreement. Rather, Metal Shark made the decision to cease further dealings with Shanghai Breeze in light of the substantial legal and business risks surrounding that relationship.

That subsequent decision does not alter the sequence of contractual duties established by the governing agreement. Shanghai Breeze had already failed to make the required progress payment, and Metal Shark's obligation to commence construction was never triggered. The Court accordingly finds that Shanghai Breeze has failed to establish that Metal Shark breached the 21 Relentless agreement.

2. Metal Shark's Counterclaim

Metal Shark asserts a counterclaim for breach of the 21 Relentless agreement. Unlike its counterclaim concerning the 29 Defiant, liability on this claim was resolved on summary judgment. See Record Document 70 at 15. As discussed above, the Court previously determined that Shanghai Breeze breached the agreement by failing to make the required progress payment and granted summary judgment in Metal Shark's favor as to liability. See id. The Court reaffirms that determination.

Louisiana Civil Code article 1994 provides that an obligor "is liable for the damages caused by his failure to perform a conventional obligation." Under Article 1995, those damages are measured by "the loss sustained by the obligee and the profit of which he has been deprived." Accordingly, Metal Shark is entitled to recover the losses and lost

profits it proves were caused by Shanghai Breeze's breach of the 21 Relentless agreement.

That determination does not necessarily entitle Metal Shark to retain Shanghai Breeze's entire $108,078.00 payment in addition to recovering its damages. Rather, the payment already received must be accounted for in determining the parties' respective recoveries and avoiding any double recovery. The Court addresses Metal Shark's proven damages and the proper treatment of Shanghai Breeze's prior payment in the damages section below.

3. Conversion

Similar to its conversion claim for the 29 Defiant funds, Shanghai Breeze also brings a conversion claim based upon Metal Shark's retention of the $108,078.00 paid toward the 21 Relentless. As with the 29 Defiant, Metal Shark initially obtained those funds lawfully pursuant to a valid contract. Shanghai Breeze subsequently breached that agreement by failing to make the additional progress payment required under the contract. As discussed above, that breach entitles Metal Shark to recover the damages caused by Shanghai Breeze's nonperformance. See La. Civ. Code arts. 1994–1995.

Shanghai Breeze's breach, however, did not automatically transfer ownership of its entire $108,078.00 payment to Metal Shark. Ultimately, Metal Shark ceased performance, never constructed or delivered the 21 Relentless, and retained the entirety of Shanghai Breeze's payment. The evidence does not establish any governmental directive requiring Metal Shark to retain those funds.

Accordingly, the Court finds that Shanghai Breeze has established conversion of the funds associated with the 21 Relentless. The amount recoverable for that conversion is addressed in the Court's damages analysis below.

4. Unjust Enrichment

As discussed above, Louisiana Civil Code article 2298 provides a remedy for unjust enrichment only when the law provides no other remedy for the impoverishment. Accordingly, unjust enrichment is a subsidiary remedy and is unavailable when another legal remedy exists to address the plaintiff's alleged loss.

Here, the Court has determined that the 21 Relentless agreement constitutes a valid and enforceable contract governing the parties' rights and obligations. Shanghai Breeze's claim to recover the funds paid under that agreement therefore arises from the parties' contractual relationship. Moreover, the Court has rejected Metal Shark's defense that the parties' agreements were absolutely null. Accordingly, because Shanghai Breeze has an available remedy under contract, it cannot recover under the subsidiary remedy of unjust enrichment. Therefore, the Court finds in favor of Metal Shark on Shanghai Breeze's unjust enrichment claim concerning the 21 Relentless.

5. LUTPA

As discussed above, LUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . .." La. R.S. 51:1405(A). The range of conduct prohibited by LUTPA is "extremely narrow" and generally encompasses only "egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct . . .." Cheramie Services, Inc., 35 So. 3d at 1060.

Shanghai Breeze has not established conduct concerning the 21 Relentless that rises to this level. Metal Shark accepted Shanghai Breeze's $108,078.00 payment and began acquiring materials in anticipation of constructing the vessel. Shanghai Breeze failed to make the additional progress payment required under the agreement, and the Court has previously determined that this failure constituted a breach of contract.

Metal Shark subsequently elected to discontinue its relationship with Shanghai Breeze after GST's arrest and the government's intervention concerning the 29 Defiant. Although the Court has found no evidence that the government specifically prohibited Metal Shark from continuing performance of the 21 Relentless agreement or directed Metal Shark to retain Shanghai Breeze's payment, Metal Shark's decision occurred against the backdrop of a federal investigation, GST's arrest, and BIS's intervention in the parties' other ongoing transaction. Under those circumstances, Metal Shark's decision to cease further business with Shanghai Breeze does not constitute the type of fraudulent, deceptive, or egregious conduct prohibited by LUTPA.

The conclusion that Shanghai Breeze has a valid claim for conversion of the funds does not compel a finding of a LUTPA violation. The evidence does not establish that Metal Shark obtained or retained the funds through fraud, misrepresentation, or deception. Rather, the parties disputed their respective rights to the funds following Shanghai Breeze's breach and the collapse of their broader business relationship. Although Metal Shark's retention of the funds constitutes conversion, that conduct does not rise to the substantially higher threshold of egregious or unethical conduct required under LUTPA. Accordingly, the Court finds that Shanghai Breeze has failed to establish its LUTPA claim concerning the 21 Relentless.

## V. Damages

1. 29 Defiant

The Court has determined that the government's intervention constituted a fortuitous event under Louisiana Civil Code article 1875, but that the event was preceded by fault attributable to Shanghai Breeze, without which Metal Shark's failure to perform would not have occurred. See id. art. 1873. The Court therefore turns to the monetary consequences resulting from the failure of the 29 Defiant transaction.

Article 1994 provides that an obligor "is liable for the damages caused by his failure to perform a conventional obligation," and Article 1995 provides that "[d]amages are measured by the loss sustained by the obligee and the profit of which he has been deprived." The extent of recoverable damages further depends upon whether the obligor acted in good or bad faith. "An obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made." Id. art. 1996. An obligor in bad faith, by contrast, "is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." Id. art. 1997.

Although the Court has found that GST's unlawful conduct constituted fault sufficient to implicate Article 1873, the evidence does not establish bad faith in the performance of the 29 Defiant agreement itself. As previously explained, the Court has found that the agreement was lawful, that the evidence does not establish that the 29 Defiant formed part of GST's criminal scheme, and that Shanghai Breeze fully paid the agreed purchase price. The Court therefore declines to characterize Shanghai Breeze as a bad faith obligor with respect to this particular agreement. Accordingly, Metal Shark may

recover those losses sustained and lost profits that were caused by the failed transaction and were reasonably foreseeable when the contract was made. See id. arts. 1994–96.

Shanghai Breeze paid Metal Shark $381,411.00 for the 29 Defiant. Allard testified that the vessel originally cost Metal Shark approximately $330,000.00 to $340,000.00 to construct. After the government directed that the vessel be returned, Metal Shark ultimately regained possession of the vessel, refurbished it, and sold it to Sea Machines for $356,677.66. These amounts must be considered together in determining Metal Shark's actual economic loss resulting from the failed transaction.

Metal Shark additionally claims $18,686.76 in redelivery costs; $1,508.75 in legal fees; $252,164.38 in lost profits; $7,739.54 in insurance costs; $15,478.95 in security and compliance costs; and $186,690.00 in refurbishment costs. Therefore, the Court considers each claimed category of damages before determining the appropriate credits for the amounts Metal Shark has already received or retained. In doing so, the Court is mindful that the purpose of contractual damages is to place Metal Shark, as nearly as possible, in the economic position it would have occupied had the transaction proceeded as contemplated, without permitting a double recovery.

The Court recognizes that the precise amount of Metal Shark's damages is not susceptible to mathematical calculation on the record presented. Louisiana law expressly provides that "[w]hen damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages." La. Civ. Code art. 1999. Thus, where the existence of a compensable loss has been established but its precise amount cannot be calculated, the factfinder may make a reasonable assessment based upon the evidence presented. See Jordan v. Travelers

Ins. Co., 245 So. 2d 151, 155 (La. 1971). This discretion does not permit an award based upon speculation or conjecture. See Nat Harrison Associates, Inc. v. Gulf States Utilities Co., 491 F.2d 578, 587 (5th Cir. 1974). Rather, the evidence must provide a sufficient basis from which the Court can make a reasonably accurate estimate. See id. Lost profits, in particular, must be established with "reasonable certainty." In re Liljeberg Enterprises, Inc., 304 F.3d 410, 448 (5th Cir. 2002) (quoting Mac Sales, Inc. v. E.I. du Pont de Nemours & Co., 24 F.3d 747 (5th Cir. 1994)).

Metal Shark is entitled to recover the $18,686.76 incurred in redelivering the 29 Defiant to its facility. The Court previously resolved this issue on summary judgment and determined that Metal Shark was entitled to recover that amount. See Record Document 70 at 15. The Court therefore includes $18,686.76 in Metal Shark's recoverable losses.

Metal Shark also seeks $1,508.75 in legal fees paid to Garcia & Artigliere. This amount is not recoverable. Under Louisiana law, attorney's fees are not recoverable as an element of contractual damages unless authorized by statute or by the contract. See Bamburg v. Air Sys., LLC, 324 So. 3d 213, 219 (La. App. 2d Cir. 2021). Even Article 1997's expanded measure of damages for bad faith nonperformance does not authorize recovery of attorney's fees. See Sher v. Lafayette Ins. Co., 988 So. 2d 186, 201 (La. 2008), on reh'g in part (July 7, 2008). Metal Shark has identified no contractual or statutory provision authorizing recovery of these fees. Accordingly, the Court awards nothing for this category.

Metal Shark seeks $7,739.54 in insurance costs and $15,478.95 in security and compliance expenses. The Court finds that Metal Shark has failed to establish that these amounts constitute losses caused by the failed 29 Defiant transaction. Allard testified that

Metal Shark's insurance covered its broader facility rather than the 29 Defiant individually. Likewise, the security measures at Metal Shark's facility protected the facility and other vessels, including military vessels, independent of the presence of the 29 Defiant. The evidence does not permit the Court to identify an incremental insurance or security expense attributable specifically to the 29 Defiant. Accordingly, Metal Shark has failed to prove that these expenses constitute losses caused by the failed transaction, and the Court awards nothing for these categories.

Metal Shark next seeks $186,690.00 in costs incurred to refurbish the 29 Defiant before its subsequent sale. Although Allard testified that Metal Shark incurred refurbishment expenses, the evidence does not permit the Court to determine what portion, if any, of those expenses constitutes a loss caused by the failure of the Shanghai Breeze transaction.

The evidence established that Metal Shark removed parts from the 29 Defiant while the vessel remained at its facility and used those parts on other vessels. Metal Shark did not identify the parts removed, establish their value, or quantify the benefit it received from their use on other vessels. Nor did Metal Shark establish what portion of the claimed refurbishment expense was incurred to replace those components. To the extent Metal Shark incurred costs to restore parts that it removed and used elsewhere, those expenses cannot simply be attributed to Shanghai Breeze without accounting for the corresponding value Metal Shark received.

The evidence likewise does not establish that the 29 Defiant required substantial refurbishment merely because it had originally been constructed for Shanghai Breeze. Allard testified that the vessel was not particularly customized for Shanghai Breeze

because it had been intended for use at a trade show. He further testified that Sea Machines purchased the vessel for a different purpose involving the testing of software and hardware. However, the record does not identify what modifications Sea Machines required.

Thus, while the Court does not doubt that Metal Shark incurred expenses before reselling the 29 Defiant, Metal Shark bears the burden of proving that the damages claimed were caused by the failed transaction. The $186,690.00 figure, standing alone, does not permit the Court to determine what portion represents a compensable loss attributable to Shanghai Breeze. Article 1999 affords the Court discretion in assessing the amount of damages when damages are insusceptible of precise measurement; it does not relieve a party of establishing that the claimed loss was actually caused by the conduct for which damages are recoverable. Accordingly, the Court declines to award Metal Shark damages for refurbishment of the 29 Defiant.

Metal Shark also seeks $252,164.38 in lost profits. At trial, Allard explained the methodology underlying this figure. The Fifth Circuit has recognized that a company president may provide "a broader range of testimony than a traditional lay witness . . . when testifying to matters concerning [his] business." Versai Mgmt. Corp. v. Clarendon Am. Ins. Co., 597 F.3d 729, 737 (5th Cir. 2010); accord Fed. R. Evid. 701 advisory committee's note to 2000 amendment (recognizing that "most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert"). More specifically, a company officer may testify concerning lost profits when the witness possesses direct knowledge of the business accounts underlying the calculation.

See Miss. Chem. Corp. v. Dresser-Rand Co., 287 F.3d 359, 373 (5th Cir. 2002) (allowing a corporation's risk manager to testify about lost profits when he had prepared lost profit statements).

Allard testified that he participated in preparing Metal Shark’s damages calculations and explained the basis for those calculations at trial. Moreover, as Metal Shark’s chief executive officer, Allard possessed particularized knowledge concerning Metal Shark’s operations, historical profit margins, use of its construction bays, and the effect of the 29 Defiant’s continued presence at the facility. Accordingly, the Court will consider Allard’s testimony and the methodology he described in determining whether Metal Shark has carried its burden of proving the claimed damages.

Metal Shark treated the construction space occupied by the 29 Defiant as unavailable for 354 days, or approximately .97 of a year. Based upon the productive output Metal Shark attributed to that space, it calculated approximately $2.1 million in revenue that otherwise could have been generated during that period. Metal Shark then applied a 12% profit margin, which Allard testified was based upon the company’s historical average, resulting in claimed lost profits of $252,164.38.

Although the Court finds that Allard was competent to explain Metal Shark’s calculation, that conclusion does not establish that each assumption underlying the calculation was proven with “reasonable certainty” as Louisiana law requires. See In re Liljeberg Enterprises, Inc., 304 F.3d at 448. At the same time, when the existence of damages has been established but their precise amount is insusceptible of measurement, the Court is afforded discretion in reasonably assessing the amount of the loss. See La. Civ. Code art. 1999.

The Court finds that Metal Shark established the existence of some economic loss associated with the 29 Defiant's continued occupation of its construction space. Allard testified that Metal Shark was operating at or near capacity during the relevant period and that the 29 Defiant occupied space that otherwise could have been devoted to the company's operations. The vessel also required Metal Shark employees to devote time to matters that would not have arisen had the transaction proceeded as contemplated, including addressing the government intervention, arranging for the vessel's return, communicating with BIS, maintaining and storing the vessel, determining how to proceed after BIS lifted the detention requirement, and ultimately locating a new purchaser. The Court credits that testimony. These were real operational burdens resulting from the failed transaction, and the Court is persuaded that they imposed an economic cost upon Metal Shark.

The Court is not persuaded, however, that the evidence supports Metal Shark's calculation of $252,164.38 in lost profits. That calculation assumes that the construction space occupied by the 29 Defiant would have generated revenue throughout the entire 354-day period had the vessel not been present. Although Allard testified that Metal Shark was operating near capacity, Metal Shark did not identify a particular contract, vessel, customer, or other revenue-producing opportunity that it was unable to pursue because the 29 Defiant occupied that space. Nor did the evidence establish that the construction space necessarily would have remained continuously occupied by other profitable work throughout the entire period. Thus, while the Court credits Allard's testimony that the vessel's presence constrained Metal Shark's productive capacity, the evidence does not establish with reasonable certainty that the company actually would have generated

approximately $2.1 million in additional revenue upon which its lost profit calculation depends.

The calculation also attributes the entire 354-day period to the failed Shanghai Breeze transaction. The Court finds that assumption overstated. The 29 Defiant returned to Metal Shark's facility in approximately January 2020, and BIS required the vessel to remain there until September 21, 2020. At that point, BIS informed Metal Shark that it was no longer required to store the vessel and could dispose of it at its discretion, subject to the restriction against delivery to Shanghai Breeze. The vessel nevertheless remained at Metal Shark's facility until approximately January 2021, when it was sold to Sea Machines after being refurbished.

The Court recognizes that Metal Shark could not reasonably have been expected to locate a new purchaser and complete a resale immediately upon receiving BIS's authorization in September 2020. Some additional period was necessarily required to determine how to dispose of the vessel, locate a purchaser, negotiate the transaction, and complete the sale. Nevertheless, the entire period between BIS's September authorization and the eventual sale cannot be treated in the same manner as the preceding period during which Metal Shark was legally required to retain the vessel. Metal Shark did not establish that governmental restrictions prevented an earlier disposition after September 2020 or otherwise demonstrate that the entire 354-day period represented unavoidable lost productive capacity attributable to Shanghai Breeze.

The Court also considers the nature of the claimed loss. Metal Shark claims the temporary loss of the opportunity to employ that space in other revenue-producing activity. Determining the profit attributable to that lost opportunity necessarily requires

assumptions about the amount of alternative work available, the extent to which that work could have been performed in the occupied space, and the revenue and profit that such work would have generated. Allard's testimony supports the conclusion that such an opportunity cost existed, but the evidence does not support Metal Shark's valuation of that opportunity at $252,164.38 with reasonable certainty.

The Court therefore declines to accept Metal Shark's lost profit calculation in full. However, the shortcomings in that calculation do not require the Court to disregard the economic loss that the evidence does establish. This is not a case in which the existence of damage is wholly speculative. The evidence establishes that the 29 Defiant unexpectedly returned to Metal Shark, occupied valuable space at a facility operating near capacity for an extended period, and required Metal Shark to devote employee time and operational resources to receiving, storing, maintaining, and ultimately disposing of the vessel. What remains uncertain is the precise monetary value of those burdens.

Considering the discretion afforded by Louisiana Civil Code article 1999, the duration of the governmental detention, the additional reasonable period necessary to dispose of the vessel, the productive capacity occupied by the 29 Defiant, the employee time and operational resources devoted to the vessel, and the deficiencies in the assumptions underlying Metal Shark's lost-profit calculation, the Court finds that $150,000.00 reasonably compensates Metal Shark for the economic loss established by the evidence. This amount recognizes the substantial operational burden imposed by the 29 Defiant's continued presence at Metal Shark's facility while appropriately accounting for the uncertainty underlying Metal Shark's claimed $252,164.38 in lost profits.

Having considered each category of damages claimed by Metal Shark, the Court finds that Metal Shark established $168,686.76 in recoverable damages attributable to the failed 29 Defiant transaction. This amount consists of $18,686.76 in redelivery costs and $150,000.00 in economic losses associated with the vessel's return and continued presence at Metal Shark's facility. Metal Shark failed to establish the remaining claimed damages.

Next, the Court must account for the amounts Metal Shark ultimately received in connection with the 29 Defiant. The purpose of contractual damages is to place Metal Shark, as nearly as possible, in the economic position it would have occupied had the transaction proceeded as contemplated. Metal Shark is not entitled to recover more than the loss caused by the failed transaction. Accordingly, before accounting for what Metal Shark ultimately received and the losses caused by the government's intervention, the Court first considers the economic position Metal Shark expected to occupy under the original agreement.

Shanghai Breeze agreed to purchase the 29 Defiant for $381,411.00 and paid that amount in full. Allard testified that the vessel originally cost Metal Shark approximately $330,000.00 to $340,000.00 to construct. Therefore, had the transaction proceeded as contemplated, Metal Shark would have received an anticipated profit of approximately $41,411.00 to $51,411.00.

Upon the government intervention, Metal Shark retained Shanghai Breeze's entire $381,411.00 purchase payment and regained possession of the 29 Defiant. Metal Shark thereafter sold the same vessel to Sea Machines for $356,677.66. Thus, Metal Shark

ultimately received a total of $738,088.66 in proceeds associated with the vessel: $381,411.00 from Shanghai Breeze and $356,677.66 from Sea Machines.

Next, the Court must account for the losses Metal Shark sustained because the original transaction failed. As determined above, Metal Shark proved $168,686.76 in recoverable damages. Deducting those damages from the $738,088.66 Metal Shark ultimately received, leaves $569,401.90. That amount still exceeds the $381,411.00 Metal Shark would have received had the Shanghai Breeze transaction proceeded as contemplated by $187,990.90. Permitting Metal Shark to keep that excess would place it in a better economic position than performance of the original contract would have produced. Therefore, the Court finds that Metal Shark must return $187,990.90 to Shanghai Breeze. This leaves Metal Shark with $550,097.76 in total proceeds. After accounting for the $168,686.76 in losses caused by the failed transaction, Metal Shark is left with $381,411.00, which is the full amount it would have received under the original contract. Therefore, this calculation places Metal Shark, as nearly as the evidence permits, in the economic position it would have occupied had the transaction proceeded as contemplated.

Accordingly, after accounting for Metal Shark's recoverable damages and the proceeds it received from the subsequent sale of the 29 Defiant, the Court finds that $187,990.90 of Shanghai Breeze's purchase payment must be returned to Shanghai Breeze.

The Court has also found that Metal Shark’s wrongful retention of Shanghai Breeze’s funds constituted conversion. Under Louisiana law, ‘[t]he measure of damages for wrongful conversion is the return of the property, or if it cannot be returned, the value

of the property at the time of conversion." Fenner v. Schley, 246 So. 3d 770, 773 (La. App. 2 Cir. 2018). The Court can also award general damages when appropriate. See id.

As calculated above, Shanghai Breeze is entitled to recover $187,990.90 of the funds retained by Metal Shark. That recovery compensates Shanghai Breeze for the converted funds themselves. Shanghai Breeze presented no evidence establishing any additional loss resulting from Metal Shark's wrongful retention of those funds. Indeed, no representative of Shanghai Breeze testified at trial concerning any consequential injury or other damages resulting from the conversion. The Court therefore finds no evidentiary basis for an additional award of conversion damages.

Accordingly, Shanghai Breeze is entitled to recover **$187,990.90** in connection with the 29 Defiant. The Court declines to award any additional damages on Shanghai Breeze's conversion claim because doing so would rest upon damages that Shanghai Breeze failed to prove.

2. 21 Relentless

The Court next considers the damages arising from Shanghai Breeze's breach of the 21 Relentless agreement. As previously determined on summary judgment and reaffirmed above, Shanghai Breeze breached the agreement by failing to remit the full progress payment required before Metal Shark was obligated to commence construction. Under Louisiana Civil Code articles 1994 and 1995, Metal Shark is entitled to recover the losses sustained and profits of which it was deprived as a result of that breach.

Shanghai Breeze paid Metal Shark $108,078.00 toward the purchase price of the 21 Relentless before ceasing further payments. Metal Shark retained that amount. At trial, Allard testified that Metal Shark incurred $63,685.74 in material costs and an additional

$21,773.41 in labor, burden, and overhead costs in anticipation of constructing the vessel, for total claimed damages of $85,459.15.

As with the 29 Defiant, the Court begins with the economic position Metal Shark would have occupied had the contract been fully performed. The 21 Relentless had a total purchase price of $216,156.00. However, unlike the 29 Defiant, the evidence does not establish Metal Shark's anticipated cost of constructing the 21 Relentless. Thus, the Court cannot determine what profit Metal Shark anticipated from the completed transaction. Metal Shark bore the burden of proving the damages caused by Shanghai Breeze's breach, including any profit of which it was deprived, and the absence of evidence concerning the anticipated cost of performance prevents the Court from calculating any lost profit on the uncompleted vessel. Accordingly, Metal Shark has not established any recoverable lost profits attributable to the 21 Relentless agreement.

Next, the Court turns to the expenditures Metal Shark contends it actually incurred before the transaction ended. At trial, Allard testified that Metal Shark incurred $63,685.74 in material costs and $21,773.41 in labor, burden, and overhead costs. However, Allard did not explain the methodology underlying these figures or otherwise provide the Court with a basis from which it could independently evaluate the amounts claimed. More significantly, none of the invoices purportedly supporting the claimed material expenses were introduced into evidence. Although there was testimony concerning some of those invoices, the Court did not receive the invoices themselves and therefore cannot determine from the documentary evidence what materials were ordered, what amounts were actually paid, or the ultimate disposition of those materials.

The testimony presented at trial further demonstrated the uncertainty surrounding the claimed material expenses. Several of the invoices discussed during Allard's testimony had apparently been cancelled. Allard also acknowledged that Metal Shark's records did not reflect a precise determination of which materials had actually been paid for, which amounts had been refunded, or which materials were ultimately used on other vessels. These deficiencies are significant because Metal Shark may recover only those losses actually sustained as a result of Shanghai Breeze's breach. It may not recover the cost of an order that was cancelled, an expenditure that was refunded, or the full value of materials that were subsequently used on other Metal Shark projects. Accordingly, the Court awards no damages for the claimed material expenses.

The Court reaches a different conclusion concerning the $21,773.41 claimed for labor, burden, and overhead. Although Allard did not provide a detailed breakdown of that figure, the evidence independently corroborates his testimony that Metal Shark devoted employee time and resources to the 21 Relentless before and after the transaction ended. Unlike the claimed material expenses, there is no indication that these expenditures were subsequently refunded or recovered through reuse.

In particular, Allard testified that the 21 Relentless was a highly customized vessel designed to fit on the back of a fisheries vessel, which required engineering and preparatory work before construction could begin. The evidence establishes that Metal Shark had begun preparing for construction by ordering materials when Shanghai Breeze ceased making the required payments. After GST's arrest and the government's intervention concerning the 29 Defiant, Metal Shark was also required to devote employee time and resources to determining how to proceed with the unfinished 21

Relentless transaction, addressing outstanding orders, attempting to cancel certain orders, and determining whether materials obtained for the vessel could be used on other projects.

Therefore, the Court finds that the evidence does establish an economic loss associated with Metal Shark's labor and preparatory efforts. Exercising its discretion under Article 1999, the Court finds that the $21,773.41 claimed in this category is consistent with the nature and extent of the preparatory and administrative work established through Allard's testimony. The Court credits that testimony and finds that $21,773.41 reasonably compensates Metal Shark for the labor, burden, and overhead associated with the 21 Relentless.

Accordingly, Metal Shark is entitled to retain $21,773.41 of Shanghai Breeze's payment as compensation for the damages caused by Shanghai Breeze's breach. Thus, Shanghai Breeze is entitled to recover the remaining **$86,304.59** that it paid for the 21 Relentless.

The Court has also found that Metal Shark's wrongful retention of Shanghai Breeze's funds constituted conversion. The $86,304.59 awarded above restores the portion of Shanghai Breeze's funds that Metal Shark was not entitled to retain after accounting for its contractual damages. Shanghai Breeze presented no evidence establishing any additional damages caused by Metal Shark's conversion of those funds. Accordingly, the Court declines to award additional damages on the conversion claim.

3. <u>Effect of the Denial Order</u>

Metal Shark contends that the 2023 Denial Order prohibits Shanghai Breeze from receiving any monetary recovery arising from the 29 Defiant and 21 Relentless

transactions. Specifically, Metal Shark argues that payment of any judgment would permit Shanghai Breeze to benefit from a transaction involving an item subject to the Denial Order. See Record Document 75 at 6. Whether the Denial Order restricts Shanghai Breeze's ability to receive payment in satisfaction of the Judgment concerns the manner in which the Judgment may lawfully be satisfied rather than the merits of the parties' underlying claims. Therefore, the Court does not resolve that issue in determining liability and damages. To the extent Metal Shark contends that applicable federal law prevents direct payment of the Judgment to Shanghai Breeze, that issue may be raised through appropriate post-judgment motion practice.

## CONCLUSION

For the reasons stated above, the Court's judgment is as follows:

### I. 29 Defiant

As to Shanghai Breeze Technology Co., Ltd.'s ("Shanghai Breeze") breach of contract claim, the Court finds in favor of Defendant Gravois Aluminum Boats, LLC d/b/a Metal Shark Aluminum Boats ("Metal Shark") and against Shanghai Breeze. Accordingly, Shanghai Breeze's breach of contract claim concerning the 29 Defiant is **DISMISSED WITH PREJUDICE**.

As to Shanghai Breeze's conversion claim, the Court finds in favor of Shanghai Breeze and against Metal Shark. The Court finds that Metal Shark wrongfully retained funds belonging to Shanghai Breeze. As set forth in the Memorandum Ruling, however, Metal Shark is entitled to recover certain losses resulting from the failed transaction, and those amounts must be accounted for in determining the amount of Shanghai Breeze's

funds Metal Shark was entitled to retain. Shanghai Breeze has not established any additional damages arising from the conversion.

As to Shanghai Breeze's unjust enrichment claim, the Court finds in favor of Metal Shark and against Shanghai Breeze. Accordingly, Shanghai Breeze's unjust enrichment claim concerning the 29 Defiant is **DISMISSED WITH PREJUDICE**.

As to Shanghai Breeze's claim under the Louisiana Unfair Trade Practices Act ("LUTPA"), the Court finds in favor of Metal Shark and against Shanghai Breeze. Accordingly, Shanghai Breeze's LUTPA claim concerning the 29 Defiant is **DISMISSED WITH PREJUDICE**.

As to Metal Shark's counterclaim arising from the 29 Defiant transaction, the Court finds, for the reasons stated in the Memorandum Ruling, that the governmental intervention constituted a fortuitous event preceded by fault attributable to Shanghai Breeze within the meaning of Louisiana Civil Code article 1873. The Court finds that Metal Shark established **$168,686.76** in recoverable damages arising from the failed transaction, consisting of $18,686.76 in redelivery cost and $150,000.00 in economic losses associated with the 29 Defiant's occupation of Metal Shark's facility and the resulting operational burdens. The Court declines to award any additional damages concerning the 29 Defiant.

After accounting for Metal Shark's recoverable damages, the $381,411.00 purchase payment retained by Metal Shark, and the $356,677.66 received by Metal Shark from the subsequent sale of the 29 Defiant, the Court finds that **Shanghai Breeze is entitled to recover $187,990.90 from Metal Shark in connection with the 29 Defiant**. The Court awards no additional damages on Shanghai Breeze's conversion claim.

## II. 21 Relentless

As to Shanghai Breeze's breach of contract claim, the Court finds in favor of Metal Shark and against Shanghai Breeze. Shanghai Breeze failed to make the progress payment required to trigger Metal Shark's obligation to commence construction. Accordingly, Shanghai Breeze's breach of contract claim concerning the 21 Relentless is **DISMISSED WITH PREJUDICE**.

As to Metal Shark's counterclaim for breach of contract, the Court finds in favor of Metal Shark and against Shanghai Breeze, consistent with the Court's prior summary judgment ruling as to liability. The Court finds that Metal Shark established **$21,773.41** in recoverable labor, burden, and overhead damages resulting from Shanghai Breeze's breach. The Court declines to award any additional damages concerning the 21 Relentless.

As to Shanghai Breeze's conversion claim, the Court finds in favor of Shanghai Breeze and against Metal Shark. Shanghai Breeze failed to establish any damages arising from the conversion beyond the funds wrongfully retained. Accordingly, the Court awards no additional damages on the conversion claim.

As to Shanghai Breeze's unjust enrichment claim, the Court finds in favor of Metal Shark and against Shanghai Breeze. Accordingly, Shanghai Breeze's unjust enrichment claim concerning the 21 Relentless is **DISMISSED WITH PREJUDICE**.

As to Shanghai Breeze's LUTPA claim, the Court finds in favor of Metal Shark and against Shanghai Breeze. Accordingly, Shanghai Breeze's LUTPA claim concerning the 21 Relentless is **DISMISSED WITH PREJUDICE**.

After accounting for Metal Shark's recoverable damages and the $108,078.00 payment retained by Metal Shark, the Court finds that **Shanghai Breeze is entitled to recover $86,304.59 from Metal Shark in connection with the 21 Relentless**. The Court awards no additional damages on Shanghai Breeze's conversion claim.

## III. Final Judgment

Accordingly, after application of all damages, credits, and amounts retained as set forth above, **IT IS ORDERED, ADJUDGED, AND DECREED that Metal Shark shall pay Shanghai Breeze the total amount of $274,295.49**, consisting of:

i. **$187,990.90** attributable to the 29 Defiant; and

ii. **$86,304.59** attributable to the 21 Relentless.

Metal Shark's recoverable damages have been incorporated into the foregoing calculations and shall not be separately recovered.

All claims and requests for relief not expressly granted herein are **DENIED AND DISMISSED WITH PREJUDICE**.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 4th of September, 2026.

JUDGE S. MAURICE HICKS, JR.
UNITED STATES DISTRICT COURT